**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| RUSSELL JAVIER MELENDRES, ERIKA JUNE OYAMMI LUBIANO, CHINONYEREM PRINCESS EZE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>PRUITTHEALTH, INC., PRUITTHEALTH – BAMBERG, LLC, PRUITTHEALTH – NEUSE, LLC, PRUITTHEALTH – TOWN CENTER, LLC, PRUITTHEALTH CONSULTING SERVICES, LLC, INFINITY CARE PARTNERS, LLC, NEIL PRUITT, JUSTIN PRICE, AMY MONTENEGRO, ANDREW HUCKABY,<br><br>Defendants. | Case No.:________________<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiffs Russell Javier Melendres, Erika June Oyammi Lubiano, and Chinonyerem Princess Eze ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated, and in the public interest, against Defendants PruittHealth, Inc., ("Pruitt"); PruittHealth Consulting Services, LLC ("Pruitt Consulting"); PruittHealth – Bamberg, LLC; PruittHealth – Neuse, LLC; PruittHealth – Town Center, LLC[1]; Infinity Care Partners, LLC ("ICP"); Neil Pruitt, Jr.; Justin Price; Amy Montenegro; and Andrew Huckaby (altogether collectively, "Defendants").

[1] Defendants PruittHealth – Bamberg, LLC, PruittHealth – Neuse, LLC, and PruittHealth – Town Center, LLC are collectively referred to as "Pruitt Providers."

Plaintiffs' allegations are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and where specifically stated, upon information and belief.

## INTRODUCTION

1. This case is about the unfair exploitation of foreign health care workers. Defendants, conspiring together, targeted what they considered an easily exploitable group—foreign health care workers. Believing that foreign health care workers could provide a cheaper alternative source of labor, Defendants enticed foreign workers with promises of better pay, rewarding work, and stable and manageable hours. Believing these promises, those workers uprooted themselves and their families, moved around the world to the United States, and began working at Defendants' various facilities in pursuit of their American dream. But that was when the dream seemed to end. When their work at Defendants' facilities began, these workers all realized the same truth: Defendants were not going to—and never intended to—deliver on their promises. The work and hours were far more intense and grueling than originally discussed, and when the workers found better jobs, they discovered that they would be required to pay a substantial contractual penalty. Any workers who left their jobs were inevitably threatened with these financial penalties. For Plaintiffs and these health care workers, reality has set in that they were trapped by Defendants in what amounted to indentured servitude.

2. Defendants are not the first to engage in such exploitation of foreign workers. Other courts, considering substantially similar scenarios, have found that such conduct amounts to illegal

labor exploitation and trafficking.[2] Despite these examples, Defendants pushed forward with their conspiracy to exploit and traffic Plaintiffs and other foreign health care workers in an effort to reap profits and ill-gotten gains, most likely hoping that their exploited workers would be none the wiser. Indeed, Defendants to engage in this exploitative conduct to this day.

3. Defendant ICP is a foreign labor recruiter that has lured countless unsuspecting health care workers primarily in the Philippines to work for Pruitt and others, whom they refer to as "partners," throughout the United States under punitive contracts, which amount to little more than indentured servitude.

4. In fact, the threats of serious financial harm begin long before the health care workers arrive in the United States. Upon signing their first contract with ICP in their home country they are immediately threatened with illegal penalties unless they enter subsequent employment contracts with ICP's partner facilities. Domestic workers are not subject to the same or similar contractual agreements.

5. Prior to immigrating to the United States, recruits are sent offer letters which describe their potential employment as "at-will." Nonetheless, before recruits arrive in the United States, they are asked to enter employment agreements provided by ICP that mandate the recruit remain with the partner company for years or pay tens of thousands of dollars. Defendants follow through on their threats by sending demand letters and suing workers[3] who dare to leave their

[2] *E.g.*, *Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2023 WL 5104066, at *8 (S.D. Ohio Aug. 9, 2023); *Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 362 (E.D.N.Y. 2023); *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019).

[3] For example, Plaintiff Russell Javier Melendres, is currently being sued in the General Court of Justice Superior Court Division of North Carolina by Defendants PruittHealth, Inc., PruittHealth–Town Center, LLC, and PruittHealth Consulting Services, Inc., for failure to pay "employer expenses" totaling $31,626.96 when she left her employment prior to the expiration of three years.

employment. The contracts used to effectuate this scheme are consistent between all "partners" of ICP, using the exact language from partner to partner.

6. ICP serves as a hub establishing conspiratorial relationships with healthcare providers throughout the United States, who are intent on recruiting and hiring cheap, exploitable foreign labor. A distinct criminal enterprise is established between ICP and these healthcare providers.

7. Pruitt maintains its scheme through fraud. It defrauds the United States government, which approves the company's visa petitions without knowing that it routinely fails to pay its workers the prevailing wages it promises and defrauds the workers themselves, who arrive in the United States and find themselves subject to unexpectedly harsh employment terms in utterly understaffed facilities with overbearing workloads that make it impossible to provide proper quality health care services to patients in need. Recruits are forced to remain in facilities that are so understaffed that they are in constant fear for their nursing license and face serious financial penalties. When recruits threaten resignation, Pruitt, through Defendant Justin Price and others, attempted (and often succeeded) to prevent them from following through with their resignation by threatening lawsuits, deportation, and potential wage garnishment, and more. Further, recruits are told and their contracts state that they are barred from seeking employment unless the contractual penalty is paid in full. When nurses request more information about the penalty, Pruitt Human Resources staff, directed by Defendant Justin Price, refer them back to ICP.

8. Defendants have profited and continue to profit from their fraudulent scheme. ICP binds unsuspecting nurses with predatory contracts and funnels them to various healthcare

---

The case bares the docket number 24CV018088-590. A copy of that complaint and summons, including its exhibits, are attached here.

providers, who bind them to their own contracts which pay them less than the average domestic worker and preventing them from leaving due to the threat of serious financial harm. Further, Defendants recoup even more money from workers who dare to leave before Defendants determine they have completed their commitment period. This is by design and is a product of Defendants' conspiracy. This lawsuit seeks to end Defendants' illegal practices and to compensate the victims.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter asserts claims under federal law.

10. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

12. Plaintiff Russell Javier Melendres ("Russell") is a Registered Nurse licensed to practice in the State of North Carolina and a former employee of Pruitt. She is a citizen of the Republic of the Philippines and currently resides in Charlotte, North Carolina.

13. Plaintiff Erika June Oyammi Lubiano ("Erika") is a Registered Nurse licensed to practice in the State of North Carolina and Washington and a former employee of Pruitt. She is a citizen of the Republic of the Philippines and currently resides in Seattle, Washington.

14. Plaintiff Chinonyerem Princess Eze ("Princess") is a Registered Nurse licensed to practice in the State of South Carolina and a former employee of Pruitt. She is a citizen of Nigeria and currently resides in Bamberg, South Carolina.

15. Defendant PruittHealth, Inc. is a Georgia corporation with its principal place of business located at 1626 Jeurgens Court, Norcross, Georgia 30093. Accordingly, for jurisdictional purposes, Defendant PruittHealth, Inc. is a citizen of Georgia.

16. Defendant PruittHealth Consulting Services, LLC is a Georgia corporation with its principal place of business located at 1626 Jeurgens Court, Norcross, Georgia 30093. Accordingly, for jurisdictional purposes, Defendant PruittHealth, Inc. is a citizen of Georgia.

17. Defendant PruittHealth – Bamberg, LLC is a South Carolina limited liability company with a principal place of business located at 439 North Street, Bamberg, South Carolina 29003. Accordingly, for jurisdictional purposes, Defendant PruittHealth–Bamberg, LLC is a citizen of South Carolina.

18. Defendant PruittHealth – Neuse, LLC is a North Carolina limited liability company with a principal place of business located at 1303 Health Drive, New Berm, North Carolina 28560. Accordingly, for jurisdictional purposes, Defendant PruittHealth–Neuse, LLC is a citizen of North Carolina.

19. Defendant PruittHealth – Town Center, LLC is a Georgia limited liability company with its principal place of business located at 6300 Roberta Road, Harrisburg, North Carolina 28075. Accordingly, for jurisdictional purposes, Defendant PruittHealth–Town Center, LLC is a citizen of North Carolina.

20. Defendant PruittHealth, Inc. contracts with separately organized healthcare providers, including, but not limited to, Defendants PruittHealth – Bamberg, LLC, PruittHealth –

Neuse, LLC, and PruittHealth – Town Center, LLC. Together with Defendant PruittHealth Consulting Services, LLC, Defendant PruittHealth, Inc. provides certain administrative services, including, but not limited to, employee recruiting, payroll and benefits administration, legal and human resources counseling, financial and accounting support, and other related administrative services for such healthcare providers. Defendant PruittHealth, Inc. is authorized to enter contracts on behalf of itself, Defendant PruittHealth Consulting Services, LLC, and its affiliated healthcare providers, including, but not limited to, Defendants PruittHealth – Bamberg, LLC, PruittHealth – Neuse, LLC, and PruittHealth – Town Center, LLC.

21. Defendant PruittHealth Consulting Services, LLC contracts with separately organized healthcare providers, including, but not limited to, Defendants PruittHealth – Bamberg, LLC, PruittHealth – Neuse, LLC, and PruittHealth – Town Center, LLC. Together with Defendant PruittHealth, Inc., Defendant PruittHealth Consulting Services, LLC provides clinical and professional management services to improve compliance and develop policies and procedures for such healthcare providers. Defendant PruittHealth Consulting Services, LLC is authorized to enter contracts on behalf of itself, Defendant PruittHealth, Inc. and its affiliated healthcare providers, including, but not limited to, Defendants PruittHealth – Bamberg, LLC, PruittHealth – Neuse, LLC, and PruittHealth – Town Center, LLC.

22. Defendant Infinity Care Partners, LLC "specializes in staffing Nursing Professionals from abroad," including from the Philippines and Kenya, where it maintains offices.[4] Defendant Infinity Care Partners, LLC is a Tennessee limited liability company with its principal place of business located at 5016 Centennial Boulevard, Suite 201, Nashville, Tennessee 37209. Accordingly, for jurisdictional purposes, Infinity Care Partners, LLC is a citizen of Tennessee.

---

[4] https://www.infinitycarepartners.com/about (last visited Dec. 10, 2024).

23. Defendant Infinity Care Partners, LLC partners with Defendants PruittHealth Inc., PruittHealth Consulting Services, LLC, PruittHealth – Bamberg, LLC, PruittHealth – Neuse, LLC, and PruittHealth – Town Center, LLC. As part of this relationship, Defendant Infinity Care Partners, LLC recruits nurses from abroad to move to the United States, to enter into employment contracts with its partner entities, to work for its partner entities for a certain minimum term, and to and discourage workers from resigning employment with its partner entities.

24. Defendant Neil Pruitt, Jr. is the Chief Executive Officer of Defendant PruittHealth, Inc. On behalf of Defendant PruittHealth, Inc., he established a venture with Defendant Infinity Care Partners, LLC, in which Defendant PruittHealth, Inc. and its subsidiaries would hire and employ foreign healthcare workers under the threat of serious financial harm through the use of illegal contractual termination fees in order to obtain and exploit cheap healthcare labor. Upon information and belief, he played a vital role in establishing and maintaining this venture with Defendant Infinity Care Partners, LLC. He has thus knowingly enforced and benefited financially from labor obtained in violation of federal and state law, regulations, and policies.

25. Defendant Amy Montenegro is employed by Defendant PruittHealth, Inc. as Senior Vice President of Talent Acquisition. On behalf of Defendant PruittHealth, Inc., she knowingly executed employment contracts containing an illegal penalty. She played a vital role in the recruitment of foreign healthcare workers, through Defendant Infinity Care Partners, LLC, to immigrate to the United States to work at Pruitt affiliated entities. She has thus knowingly benefited financially from labor obtained in violation of federal and state law, regulations, and policies.

26. Defendant Justin Price is employed by Defendant PruittHealth, Inc as a Corporate Partner Services Manager. On behalf of Defendant PruittHealth, Inc., he has intimidated recruited

workers with threats of serious financial harm to prevent recruits from leaving Pruitt affiliated entities, and he has routinely encouraged an environment of intimidation by "reminding" recruits of their contract obligations when one of their co-workers resigned. He has thus knowingly enforced and benefited financially from labor obtained in violation of federal and state law, regulations, and policies.

27. Defendant Andrew Huckaby is the Chief Executive Officer of Defendant Infinity Care Partners, LLC. On behalf of Defendant Infinity Care Partners, LLC, he established a venture with Defendant PruittHealth, Inc., in which Defendant Infinity Care Partners, LLC, would staff Defendant PruittHealth, Inc.'s facilities with foreign healthcare workers. Specifically, under this venture, Defendant Infinity Care Partners, LLC would attract foreign healthcare workers to apply for work in the United States, directing these foreign healthcare workers to apply to and be hired and employed by Defendant PruittHealth, Inc. and its subsidiaries for work at Pruitt facilities. Under this venture, these foreign healthcare workers were hired under the threat of serious financial harm through the use of illegal contractual termination fees in order for Defendants to obtain and exploit cheap healthcare labor. Upon information and belief, he played a vital role in establishing and maintaining this venture with Defendant PruittHealth, Inc. He has thus knowingly enforced and benefited financially from labor obtained in violation of federal and state law, regulations, and policies

## PLAINTIFFS' ALLEGATIONS

***Plaintiff Javier "Russell" Melendres***

28. Plaintiff Melendres was a foreign healthcare worker in the Philippines.

29. Plaintiff Melendres was contacted by ICP after applying online. She was interviewed and was asked about background and experience. She was offered a position in a skilled nursing facility. She began the immigration process with ICP in December 2021. She was promised superior nursing opportunities in the United States and asked to sign an Immigration Service Agreement with ICP. This agreement placed her immediately under threat of serious financial penalties, ranging from $1,000.00-$5,000.00 depending on when in the process Russell would have backed out. ICP is keenly aware that Philippine's nurses only make approximately $400.00 (four hundred) USD a month. Essentially forcing her to accept the terms of employment offered by ICP's partner because backing out places insurmountable financial harm on her equaling up to a year of her Philippine's wages.

30. Despite substantial experience, including a decade as a neonatal nurse, Plaintiff Melendres was told she would only qualify to work in a skilled nursing facility in the United States. During the interview with Pruitt, she asked about the nurse-to-patient ratio. She was informed she would have about 18-20 patients with appropriate number of CNAs to help with the patient load. Russell was not informed during the two interviews that she would be handling patients with dementia. She was under the impression she would be providing patients with acute rehab, acute skilled nursing, and post-surgery care. She was reassured she would have sufficient help from CNAs. Just days later Russell attended a virtual interview with a Pruitt representative. Following the interview she received an offer letter from ICP, with ICP's information in the heading, stating in pertinent part "PLEASE BE ADVISED THAT THIS IS NOT INTENDED TO BE AN EMPLOYMENT CONTRACT OF ANY DURATION, BUT AN OFFER AT-WILL OF EMPLOYMENT WITH A CLIENT FACILITY OF INFINITY CARE PARTNERS." The offer letter required Plaintiff Melendres's signature.

31. Plaintiff Melendres asked about the hourly pay and the cost of living in North Carolina, because cost of living was another concern to her. She conducted her own research into North Carolina's cost of living while living in Philippines but felt she did not fully understand North Carolina's cost of living after her research. Accordingly, Plaintiff Melendres asked ICP to clarify her questions regarding the cost of living, specifically she asked if the twenty-nine dollars per hour offer was sufficient to cover the cost of living. ICP reassured her the offer of twenty-nine dollars per hour was sufficient to cover the cost of living in North Carolina. Multiple days later, and after Plaintiff Melendres had signed the Immigration Service Agreement with ICP, ICP presented her with an employment agreement. The employment agreement had Pruitt as the employer and herself as the employee. The agreement contained a provision that required Plaintiff Melendres pay up to $40,000.00 in "employer expenses" if she were to leave her employment before three years had lapsed.

32. At this point, Plaintiff Melendres no longer had the option to back out due to the threat of serious financial harm. Defendants conspired and carefully crafted this scheme to bind and threaten Plaintiff Melendres with illegal penalties as soon as possible.

33. The purpose of this disproportionate penalty provision is also clear from the Plaintiff Melendres' interactions with Pruitt (which matches the experiences of all Plaintiffs). When Plaintiff Melendres inquired about when the penalty would be due, her supervisor's response was that she did not know because usually employees just do not leave due to the looming financial harm. Subsequently, Plaintiff Melendres was threatened by Defendant Justin Price that she would have to pay Pruitt $35,068.49 in "employer expenses," because she had worked just over four months. On a phone call with Zipporah Anderson, the Regional Partner Services Manager for Pruitt, when Plaintiff Melendres inquired what the basis for the $40,000.00 penalty was, she was

instructed to "call the people she made the contract with," presumably referring to ICP. This illustrates the joint conspiracy between Defendants to prevent foreign healthcare workers from leaving their contracts by establishing overly punitive penalties that are designed to ensure foreign healthcare workers are too scared to leave their employment. Plaintiff Melendres was also told that she was not allowed to seek other employment unless she pays the $35,068.49, and that she would not be allowed to make payments, and the total amount would be due in 90 days from her last day of employment. Pruitt made it obvious the fee was intended to prevent her and others from resigning.

34. Indeed, Plaintiff Melendres is currently facing this threat of serious financial harm, as she is currently being sued in the General Court of Justice Superior Court Division of North Carolina by Defendants PruittHealth, Inc., PruittHealth–Town Center, LLC, and PruittHealth Consulting Services, Inc., for failure to pay "employer expenses" totaling $31,626.96.

***Plaintiff Erika June Oyammi Lubiano***

35. Plaintiff Lubiano was a foreign healthcare worker in the Philippines.

36. Plaintiff Lubiano was recruited through a Facebook page for foreign nurses. She messaged the group on Facebook and received a response. Plaintiff Lubiano experienced essentially the same recruitment process as Plaintiff Melendres including the same threats of serious financial harm and litigation. She was promised superior nursing opportunities in the United States and asked to sign an Immigration Service Agreement with ICP. This agreement placed her immediately under threat of serious financial penalties, ranging from $1,000.00-$5,000.00 depending on when in the process Plaintiff Lubiano would have backed out.

37. Plaintiff Lubiano was interviewed by Pruitt and was ultimately presented an employment agreement that mirrors the other Plaintiffs. The employment agreement included an

illegal penalty of $40,000.00 if Plaintiff Lubiano left Pruitt before the expiration of three years from her start date.

38. During Plaintiff Lubiano's employment with Pruitt, she was concerned with the patient ratio during the nightshift. During the hours between 11:00 p.m. and 7:00 a.m., Plaintiff Lubiano and a single nother nurse would split forty to forty-five patients. She believes that the number of patients assigned to two nurses was not safe. Plaintiff Lubiano complained about the patient ratio and raised her safety concerns, but Pruitt refused to address them.

39. Further, Plaintiff Lubiano did not have a permanent schedule for five months, while other non-Filipino nurses, had permanent schedules. Moreover, her supervisor repeatedly denied her time off requests. On one occasion when she called out of work, she was told that she would be required to work multiple weekend shifts to make up for the one call in. Thus, Plaintiff Lubiano was not treated the same as non-foreign healthcare workers, but when she raised these concerns, Pruitt refused to address them.

***Plaintiff Chinonyerem "Princess" Eze***

40. Plaintiff Eze was a foreign healthcare worker in Nigeria.

41. Plaintiff Eze experienced essentially the same threats of serious financial harm and litigation. Initially, Plaintiff Eze received an email directly from ICP inquiring about her interest in ICP's services. ICP then immediately asked Plaintiff Eze to sign an Immigration Service Agreement, which contained the same above outlined illegal penalty provision threatening serious financial harm should she chose not to accept employment with ICP's chosen partner. In fact, per this agreement, Plaintiff Eze would have to pay between $1,000 - $5,000 if she refused to accept employment with Pruitt. At the time, Plaintiff Eze earned approximately $33.00 USD per month working as a nurse in Nigeria. This penalty provision even at its lowest immediately placed

Plaintiff Eze under the threat of serious financial harm. Plaintiff Eze was not informed during her interview that she would be transferred.

42. After signing the Immigration Service Agreement, Plaintiff Eze was presented with an employment agreement. The employment agreement included an illegal penalty of $40,000.00 if Plaintiff Eze left Pruitt before the expiration of three years from her start date. Plaintiff Eze was scared to consent to this agreement but felt forced because she could not afford to break the Immigration Service Agreement with ICP. Plaintiff Eze felt—mistakenly—that United States law would prevent companies from unfairly preying upon foreign workers seeking to work in the United States. Based on this mistaken believe, Plaintiff Eze signed the two contracts with ICP and Pruitt.

43. After Plaintiff Eze signed the contracts, ICP arranged flights for her and her husband to the United States to begin employment. After traveling a few days to the airport, Plaintiff Eze was informed by the airport that her flights were canceled. She then received an email from ICP informing her of the same. After explaining her situation, ICP found another flight for her and her husband that required additional fees. ICP forced Plaintiff Eze to pay these additional flight fees.

44. After working for Pruitt for some time, Plaintiff Eze requested a raise but was not given a raise. Plaintiff Eze's contract stated she would work forty hours a week. However, she was only working three shifts equaling to thirty-six hours a week, which affected her pay. She then attempted to work additional half days to raise her hours to the contractually promised amount, but Pruitt informed her not to come in for the half days because it was impacting their scheduling of other employees. As a result, Plaintiff Eze's schedule changed to four days one week, 48 hours, and three days the next week, 36 hours, resulting in her receiving fewer hours than originally

promised (when aggregated across a two-week period). However, while fixing one issue, this new schedule created a situation where Plaintiff Eze worked overtime but never received any overtime pay.

**GENERAL FACTUAL ALLEGATIONS**

45. ICP recruits foreign healthcare workers, brings them to the United States, and sells their labor to ICP "partners," including the Pruitt Providers. ICP predominantly recruits foreign healthcare workers from the Philippines.

46. ICP and its partners ruthlessly exploit and take advantage of these foreign workers who are more vulnerable to exploitation than domestic workers. Defendants offer lower wages and subject foreign health care workers to harsher working conditions without the risk of them immediately leaving because Defendants threaten serious financial harm through illegal penalties in their contracts. Defendants have developed a system of contracts threatening serious financial harm, which indentures and traps these foreign workers, and which unfortunately has proven to be a lucrative business model for Defendants.

47. This blatant exploitation of foreign workers is the exact type of behavior that harms domestic and foreign workers, business competition, and the United States employment market as a whole and is directly prohibited by multiple immigration laws and labor trafficking laws.

***Relevant Immigration Laws for Foreign Labor***

48. Obtaining foreign labor is heavily regulated because foreign labor exploitation carries negative economic impact on foreign workers and the domestic job market.

49. Employers sponsoring green card workers employed in healthcare occupations under the EB-2 and EB-3 visa categories must make various attestations to the federal government to hire those workers.

50. In obtaining the required the Department of Labor ("DOL") employment certification to obtain an EB-2 or EB-3 green card visa, an employer must typically complete and sign Form ETA-9089 and obtain DOL certification that there are no United States workers willing and capable of doing the job before then petitioning United States Citizenship and Immigration Services ("USCIS") to seek such a visa.

51. Employers are not permitted to seek or receive payment of any kind for any activity related to obtaining the permanent labor certification, including attorneys' fees. Payment includes, but is not limited to, monetary payments; wage concessions (including deductions from wages, salary, or benefits); kickbacks, bribes, or tributes; in kind payments; and free labor.

52. Defendants knew that their established penalties included in foreign healthcare workers' contracts constituted "payments." Thus, Defendants knowingly violated these prohibitions by including these illegal penalties in foreign healthcare workers' contracts, and knowingly misrepresented to the government that they complied with applicable laws and regulations.

53. For certain occupations, the DOL has predetermined there are insufficient U.S. workers who are willing and capable. These occupations are referred to as "Schedule A" occupations and include nurses and physical therapists.

54. Thus, when petitioning for green card visas for workers in "Schedule A" occupations, petitioners file the Form I-140, Immigrant Petition for Alien Workers and the ETA-Form 9089 directly with USCIS.

55. As part of Form 9089, the employer must attest that the employer will pay at least the prevailing wage, which is determined by the DOL based on the "average wage paid to similarly employed workers in a specific occupation in the area of intended employment." The purpose of the prevailing wage requirement is to ensure that the hiring of a foreign worker will not adversely affect the wages and working conditions of comparably employed U.S. workers.

56. Defendants knew that their established penalties included in foreign healthcare workers' contracts would adversely affect the wages of Plaintiffs and other foreign healthcare workers. Thus, Defendants knowingly misrepresented to the government that their contractual penalties, which threaten serious financial harm and litigation against foreign healthcare workers, would not reduce the wages of Plaintiffs and other foreign healthcare workers below the mandated prevailing wage.

57. Moreover, Defendants knew that their established penalties included in foreign healthcare workers' contracts would adversely affect the wages and working conditions of comparably employed U.S. workers. Thus, Defendants knowingly misrepresented to the government that their contractual penalties, which threaten serious financial harm and litigation against foreign healthcare workers, would not reduce the wages of and negatively impact the working conditions of comparably employed U.S. workers.

58. The employer must also attest that the employer will be able to place the green card worker on payroll on or before the date of proposed entry into the United States. Further, the employer must certify that the job opportunity's terms, conditions, and occupational environment are not contrary to federal, state, or local law.

59. Defendants knew that their established penalties included in foreign healthcare workers' contracts violated the law, including but not limited to violation of the TVPA. Thus,

Defendants knowingly misrepresented to the government that they complied with applicable federal, state, or local laws.

60. Additionally, when petitioning for a green card visa for Schedule A occupations, a petitioner attests that the job opportunity involves full-time and permanent employment, meaning that it will employ the beneficiary full-time, guarantee a full-time wage, and pay them that wage.

61. The promised wages must be free and clear of any deductions, penalties, kickbacks, or recoupment. Costs and expenses related to obtaining visas, and foreign labor are considered business expenses that when recouped are deductions from those workers' wages.

62. Defendants knew that their established penalties included in foreign healthcare workers' contracts constituted a deduction, penalty, kickback, or recoupment owed by the foreign healthcare worker employees intended to cover the costs associate with Defendants' obtaining their visas and other immigration-related costs. Defendants knowingly misrepresented to the government that their contractual penalties did not constitute such a deduction, penalty, kickback, or recoupment that would cover the costs associated with obtaining visas and other immigration-related costs.

63. Through their conduct, Defendants have violated local, state, and federal laws, and continue to violate local, state, and federal laws.

64. Through their conduct, Defendants have misrepresented and defrauded the government, and continue to misrepresent and defraud the government, by violating these certifications and attestations required during the immigration process, all in an effort to obtain cheap foreign labor and to establish an indentured workforce.

***Recruitment, Hiring, and Work Conditions for the Foreign Healthcare Workers***

65. As illustrated by Plaintiffs' experiences, ICP carefully planned its scheme to attract and trap foreign health care workers. The moment a foreign health care worker with marketable credentials inquires with ICP about opportunities in the United States, ICP tries to obtain a signature on a contract that threatens financial harm, which essentially creates an indentured service relationship—unknown to the foreign healthcare workers, but by ICP's and Defendants' design.

66. ICP offers health care working opportunities in the United States to all foreign health care worker with marketable credentials. However, ICP places limitations on these opportunities, requiring foreign healthcare workers to agree to pay Defendants significant fines if they ever wish not to proceed with work with Defendants. For example, ICP establishes a $1,000 to $5,000 penalty should a foreign healthcare worker wish not to proceed with the immigration process or the hiring process with one of the Defendant healthcare providers in the United States.

67. These penalties are significant, especially given that ICP appears to chiefly operate by recruiting foreign healthcare workers out of the Philippines, where they earn only approximately $8,000 to $12,000 annually. Thus, ICP's established contractual penalties represent a *significant* portion of a foreign healthcare worker's annual income and is overly punitive in nature.

68. By the time ICP offers a job from a United States health care provider, including Defendants, the foreign health care workers no longer have the option to decline due to the financial harm threatened—because the contractual penalties would apply and would require the foreign health care workers to pay significant sums to ICP.

69. The threat of serious financial harm posed to the foreign health care workers only worsens when signing the employment agreement with a United States health care provider

(including Defendants), because the employment contract contains an *additional* penalty of $40,000 dollars, should the foreign health care worker decide to leave employment prior to the expiration of the three-year employment term.

70. And Defendants have taken to seeking to enforce these penalties. For example, Defendants have brought suit against numerous foreign healthcare workers seeking to recover the overly punitive penalties established in their employment contracts, including against Plaintiff Melendres.

***The Threat of Serious Financial Harm for Foreign Healthcare Workers***

71. As a result of Defendants' scheme, foreign health care workers feel compelled to keep working for the Pruitt Providers under misrepresented conditions, through a scheme of contracts threatening various serious and illegal monetary penalties, which the contracts call "reimbursement of employer expenses" for up to $40,000.00. The contract does not provide how the amount is determined. Pruitt Providers reserve the right to calculate the exact "employer expenses," presumably based on how much of the three-year employment commitment is satisfied at the time the foreign healthcare worker ceases employment with the Provider.

72. These clauses are so vague that they necessarily require the foreign healthcare workers to inquire into how to satisfy this illegal penalty. The vague, undefined nature of the penalties is by design and part of Defendants' carefully designed scheme to deter the foreign healthcare workers from leaving their employment out of fear that they will owe such harsh, punitive penalties.

73. Providers also threaten that should they have to undertake any efforts to collect the repayment of "Employer Expenses," the foreign healthcare worker will be liable for all costs and expenses incurred, including attorneys' fees related to such collection efforts.

74. As discussed above, the foreign healthcare workers are also threatened with other illegal penalties, that would apply if they do not sign the employment contract with the Pruitt Providers. As outlined below, ICP levies illegal fees in amounts up to $5,000, even before the foreign health care workers can review and consider the Pruitt Provider's employment contract.

| | |
|---|---|
| Intake session, review of documents, employment search | USD$ 1,000.00 |

2

| | |
|---|---|
| Interviewed by employer | USD$ 2,000.00 |
| Offer accepted, contract with employer executed | USD$ 3,000.00 |
| Prevailing Wage Determination, I-140 Application Filed | USD$ 5,000.00 |
| Any additional dependents added at a later date of I-140 filing will be a passthrough cost from immigration lawyer fees of USD$ 1,000.00 per dependent | |

75. This creates a situation, designed by Defendants, that places foreign healthcare workers under threat of serious financial harm and essentially eliminates their ability to decline Defendants' offer of employment. Once the foreign healthcare workers are presented with the Pruitt Provider's contract containing harsh illegal penalties, they already risk incurring thousands

of dollars in penalties if they do not sign the Provider's contract and leave abroad for a minimum of three years.

76. In this case, Plaintiffs Lubiano, Eze, and Melendres, were brave enough to face the threatened serious financial harm due to the impossible-to-tolerate working conditions and, as a result, the Pruitt Defendants have demanded they pay $29,391.12, $31,626.96, and $21,072.48, respectively—amounting to significant portions of their annual salaries (and the equivalent to multiple years' worth of salaries in their home countries).

77. Additionally, the penalty provision is manifestly unreasonable and disproportionate to any actual damage suffered by Defendants because among expenses and costs Defendants try to recoup in violation of immigration law, the amount levied are not tied to any reasonable expenses and legally reimbursable expenses.

78. It is unsurprising that when threatened with penalties amounting significant portions of their annual Pruitt salaries, Plaintiffs and other foreign healthcare workers under these conditions decide they must continue to work—even under intolerable conditions—through the employment term.

79. Indeed, the contractual penalties are designed to be excessive and amount to a significant portion of a foreign healthcare worker's annual salary in order to act as a deterrent. Defendants deliberately designed this scheme and pattern intended to cause Plaintiffs and others under the same contracts to believe that they would suffer serious harm if they tried to leave Providers employment or find other employment. ICP even advertises on their website that their recruits come with a three-year commitment.

80. The penalty is designed to threaten serious enough financial harm that the foreign healthcare worker continues their employment with the Defendants.

81. The penalty is disproportionate to the actual costs incurred by the Defendants.

82. The penalty is disproportionate to the compensation paid to the Plaintiffs.

83. The purpose of the penalty is not to compensate Defendants for actual or potential damages and is in no way tied to losses actually incurred or designed in any way to make Defendants whole.

84. The purpose of the penalty is to prevent plaintiffs from leaving their employment with Pruitt Providers and to continue to obtain and provide Plaintiffs' employment for Defendants' benefit.

85. The Defendants have brought and threatened to bring the same types of baseless lawsuits against other foreign healthcare workers to prevent them from exercising their right to stop working for the Defendants and seek other employment.

86. Plaintiffs and other foreign healthcare workers reasonably feared serious financial if they did not continue working for Defendants.

87. The purpose of the lawsuits against Plaintiffs was not to recover actual losses, but to send a message to all foreign healthcare workers that they will face civil litigation and incur substantial attorneys' fees if they stop working for the Defendants.

88. The Defendants' baseless and abusive lawsuits trying to enforce blatantly illegal and unenforceable contract provisions against Plaintiffs and other foreign nurses are part of a longstanding pattern and practice designed to induce fear and prevent foreign nurses from seeking other employment.

89. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other foreign healthcare workers paid money to prevent and defend enforcement of the illegal penalty provision against them, including but not limited to reasonable attorneys' fees. Upon

information and belief, some foreign healthcare workers and Class Members have made payments to the Defendants to satisfy the unenforceable illegal penalty provision in an effort to prevent litigation.

## ADDITIONAL RICO ALLEGATIONS

90. Defendants—comprising the Pruitt Defendants and ICP—collectively constitute an "enterprise" as defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4).

91. Defendants have maintained an ongoing relationship for several years. Through the relationship, ICP recruited foreign healthcare workers for work in the United States, funneling them to Pruitt for employment. Pruitt petitioned or applied for those workers' visas and employed them once they came to the United States. The entities continue to maintain this relationship.

92. ICP advertises to foreign healthcare workers in the Philippines (among other places) opportunities for gainful employment in the United States. ICP communicates with the foreign healthcare workers and lock them into contracts threatening serious penalties on behalf of Defendants. As the foreign healthcare workers have questions about the recruitment and employment process, ICP serves as the go-between for Pruitt and the healthcare workers in terms of connecting them for hiring interviews, coordinating travel and arrival dates, preparing necessary paperwork, and preparing for embassy interviews. Pruitt (or any other healthcare provider who partners with ICP) petitions and/or applies for the hired foreign healthcare workers' visas. Once the foreign healthcare workers arrive in the United States, Pruitt (or any other healthcare provider

who partners with ICP) employs the foreign healthcare workers, placing them at healthcare facilities they own or operate.

93. Throughout this period, Defendants have maintained a common purpose of recruiting, processing, and hiring inexpensive foreign healthcare workers to perform work in the United States.

94. Defendants, along with ICP's other clients in the United States have also maintained an ongoing relationship for several years under which ICP has recruited foreign healthcare workers and connected them to Pruitt and other healthcare providers. Throughout this period, Defendants have maintained a common purpose of recruiting and hiring inexpensive foreign healthcare workers to perform work in the United States bound to one employer for a minimum of three years, establishing substantial contractual penalties to enforce these minimum periods.

95. The enterprise is engaged in interstate commerce in that its activities and transactions, which relate to the international and interstate movement of workers, impact interstate commerce and frequently require travel and communications across state and international lines. Moreover, Defendants operate out of different states, and their activities through the enterprise use and exploit the United States federal immigration process.

96. Defendants have conducted or participated directly in the enterprise's affairs. Defendants have been directly engaged in the racketeering activity alleged here, including by providing material misrepresentations to the government regarding the employment of foreign healthcare workers, making material misrepresentations to foreign healthcare workers before they entered the United States, and maintaining policies designed to force those foreign healthcare workers to continue working under threats of substantial financial harm. Defendants engaged in

these activities to further the enterprise's purpose of recruiting and importing into the United States inexpensive foreign healthcare workers to work in Pruitt and other ICP-partnered facilities.

97. Defendants have used the enterprise and the existence of distinct corporate entities within the enterprise to engage in the alleged racketeering activity. Defendants work cooperatively to obtain United States labor certifications and visas for recruited foreign healthcare workers who then come to the United States and are employed by Pruitt (and other healthcare providers who partner with ICP),.

## CLASS ACTION ALLEGATIONS

98. Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of the provisions of Rule 23.

99. Plaintiffs assert that it is appropriate to certify this suit as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

100. Plaintiffs seek to represent the following Nationwide Class:

> All persons in the United States who were recruited by ICP to work in the United States, who immigrated to the United States, who were hired by one of the Defendants, and who worked at a facility owned or operated by one of the Defendants in the United States.

101. Plaintiffs seek to represent the following classes in certain states (North Carolina and South Carolina) (collectively, the "State Classes"):

> All persons in North Carolina who were recruited by ICP to work in the United States, who immigrated to the United States, who were hired by one of the Defendants, and who

> worked in at a facility owned or operated by one of the Defendants in North Carolina.
>
> All persons in South Carolina who were recruited by ICP to work in the United States, who immigrated to the United States, who were hired by one of the Defendants, and who worked in at a facility owned or operated by one of the Defendants in South Carolina.

102. ***Numerosity:*** Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands of putative Class Members who are generally ascertainable by appropriate discovery.

103. ***Commonality:*** This action involves common questions of law and fact, which predominate over questions affective individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a. whether Defendants engaged in a policy and practice of failing to pay foreign health care workers the federally mandated prevailing wage;

b. whether Defendants engaged in a policy and practice of using baseless and abusive legal action and threats of such legal action to coerce foreign health care workers to continue working for them;

c. whether Defendants engaged in a policy and practice of using an improper contractual penalty to coerce foreign healthcare workers to continue working for them;

d. whether Defendants engaged in a policy and practice of charging healthcare workers for labor certification costs in violation of United States immigration laws;

e. whether Defendants' contractual penalty provisions are illegal and/or unenforceable;

f. whether Defendants' conduct violated United States immigration laws, regulations, and/or policies;

g. whether Defendants' conduct violated United States labor laws, regulations, and/or policies;

h. whether Defendants' conduct violated local, state, and/or federal laws, regulations, and/or policies;

i. whether Defendants' relationship with one another, and their conduct, constituted a conspiracy;

j. whether Defendants' relationship with one another, and their conduct, established and constituted a criminal enterprise, and whether Defendants' conduct violated federal law;

k. whether Defendants were unjustly enriched by and through their conduct; and

l. whether Plaintiffs and Class Members are entitled to equitable or injunctive relief.

104. ***Typicality:*** Plaintiffs' claims are typical or those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct described above and were subject in the same manner to Defendants' conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the proposed Classes.

105. ***Adequacy of Representation:*** Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that they have no disabling conflicts of interest that would be

antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the other Class Members, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in class action litigation, and Plaintiffs intend to prosecute this action vigorously.

106. ***Superiority:*** Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical.

107. The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class Members and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

108. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

109. Notice of a certified class action and of any result or resolution of the litigation can be provided to Class Members by first-class mail, email, or publication, or such other methods of notice as deemed appropriate by the Court.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT ("TVPA")
### 18 U.S.C. § 1595, *et seq.*
### (On behalf of Plaintiffs and all Classes)

110. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

111. The Trafficking Victims Protection Act ("TVPA") imposes liability on anyone who knowingly provides or obtains the labor or services of a person by means of threats of serious harm, the abuse or threatened abuse of law or legal process, or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm.

112. The TVPA prohibits anyone from engaging in peonage (18 U.S.C. § 1581); sale into involuntary servitude (18 U.S.C. § 1584); forced labor (18 U.S.C. § 1589); trafficking with respect to peonage or forced labor (among other prohibited acts) (18 U.S.C. § 1590). Moreover, the TVPA establishes that it is a violation to engage in any such prohibited conduct, to attempt to engage in any such prohibited conduct, or to conspire to engaged in any such prohibited conduct. 18 U.S.C. § 1594(a)-(b).

113. The TVPA establishes that an individual who is a victim of any violation of the TVPA "may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." 18 U.S.C. § 1595(a).

114. The TVPA defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

115. Contract provisions threatening between $15,000 and $25,000 in termination penalties have been found to constitute a threat of serious harm as defined in the TVPA.[5]

116. The contract provisions created by Defendants which establish substantial termination penalties constitute a threat of serious harm to Plaintiffs and other Class Members. Moreover, Defendants' use of the legal process to enforce these provisions constitutes serious harm against and the threat of serious harm to Plaintiffs and other Class Members.

117. Defendants knowingly provided and obtained the labor and services of Plaintiffs and other Class Members by means of serious harm and threats of serious harm, including without limitation psychological, financial, or reputational harm that was sufficiently serious to compel a

---

[5] *Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2023 WL 5104066, at *8 (S.D. Ohio Aug. 9, 2023); *Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 362 (E.D.N.Y. 2023); *Paguirigan v. Prompt Nursing Agency Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019).

reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

118. The TVPA defines an "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. 1589(c)(1).

119. The contract provisions created by Defendants which establish substantial termination penalties constitute an abuse or threatened abuse of law or legal process to Plaintiffs and other Class Members. Moreover, Defendants' use of the legal process to enforce these provisions constitutes an abuse or threatened abuse of law or legal process to Plaintiffs and other Class Members.

120. Defendants knowingly provided and obtained the labor and services of Plaintiffs and other Class Members by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in order to exert pressure on Plaintiffs and other Class Members to continue working for Defendants and to refrain from seeking employment elsewhere.

121. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described above, knowingly or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

122. Defendants knowingly recruited, transported, provided, and obtained Plaintiffs and other Class Members for labor or services in violation of 18 U.S.C. §§ 1589, 1590, 1594(a), and 1594(b).

123. Plaintiffs suffered damages as a direct and proximate result of Defendants' conduct.

124. Plaintiffs are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

125. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT II**
**CONSPIRING TO VIOLATE THE TRAFFICKING VICTIMS PROTECTION ACT ("TVPA")**
**18 U.S.C. § 1594(b)**
**(On behalf of Plaintiffs and all Classes)**

126. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

127. Defendants conspired to violate 18 U.S.C. §§ 1589 and 1590.

128. Defendants agreed to provide and obtain the labor and services of Plaintiffs and other Class Members by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in order to exert pressure on Plaintiffs and other Class Members to continue working for the Defendants or to refrain from seeking employment elsewhere.

129. Defendants agreed to provide and obtain the labor and services of Plaintiffs and other Class Members by means of serious harm and threats of serious harm to Plaintiffs and other Class Members, including without limitation psychological, financial, or reputational harm that

was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

130. Defendants agreed to benefit, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

131. Defendants agreed to recruit, transport, provide, and obtain Plaintiffs and other Class Members for labor or services in violation of 18 U.S.C. §§ 1589 and 1590.

132. Each of the Defendants engaged in at least one overt act in furtherance of the conspiracy, including:

a. Defendant ICP required Plaintiffs and other Class Members to execute a contract with illegal penalties threatening Plaintiffs and other Class Members with thousands of dollars of fees should they not proceed to work with the Pruitt Defendants, and threatened to commence legal action to enforce these provisions, for the purpose of coercing Plaintiffs and other Class Members to sign and begin employment with, and remain in their employment with, the Pruitt Defendants.

b. The Pruitt Defendants required Plaintiffs and other Class Members to execute contracts with illegal penalties threatening Plaintiffs and other Class Members with thousands of dollars of fees, and threatened to commence legal action to enforce these provisions, for the purpose either of preventing

Plaintiffs and other Class Members from leaving their employment with the Pruitt Defendants.

c. Defendant Justin Price warned, cautioned, and threatened Plaintiffs and other Class Members that the Pruitt Defendants would commence legal action against Plaintiffs and other Class Members seeking to enforce the full contract termination penalty, in an effort to prevent Plaintiffs and other Class Members from leaving their employment with the Pruitt Defendants.

133. Each of the Defendants intentionally engaged in these acts and additional acts in furtherance of their conspiracy to deny Plaintiffs and other Class Members the compensation they were entitled to under their employment agreements and to coerce Plaintiffs and other Class Members to continue working for the Defendants and not to seek employment elsewhere. As a result of Defendants' illegal threats and contract provisions Plaintiffs and other Class Members remained employed by the Pruitt Defendants longer than they otherwise would have, out of fear that legal action would be taken against them.

134. Plaintiffs suffered damages as a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. §§ 1589 and 1590.

135. Plaintiffs are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

136. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

## COUNT III
## ATTEMPTING TO VIOLATE THE TRAFFICKING VICTIMS PROTECTION ACT ("TVPA") 18 U.S.C. § 1594(b)

**(On behalf of Plaintiffs and all Classes)**

137. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

138. Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590.

139. Plaintiffs suffered damages as a direct and proximate result of Defendants' attempts to violate 18 U.S.C. §§ 1589 and 1590.

140. Plaintiffs are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

141. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT IV**
**RACKETEERING ACTIVITY UNDER 18 U.S.C. § 1343**
**IN VIOLATION OF THE RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. § 1961, *et seq.***
**(On behalf of Plaintiffs and all Classes)**

142. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

143. The Racketeer Influence and Corrupt Organizations Act ("RICO") prohibits "racketeering activity."

144. "Racketeering activity" includes conduct relating to wire fraud in violation of 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1).

145. Defendants are "persons," as defined by RICO, 18 U.S.C. § 1961(3).

146. As described above, Defendants' conduct constitutes a RICO "enterprise," as defined by 18 U.S.C. § 1961(4). Specifically, Defendant ICP, together with the separate and distinct

Pruitt Defendants, worked cooperatively to recruit and hire foreign healthcare workers in violation of local, state, and federal law. In the alternative, Defendants, together with Pruitt's clients, constitute such an enterprise.

147. Defendants have engaged in the following knowing and material fraudulent representations to and concealments of material facts from foreign healthcare workers, including Plaintiffs and other Class Members, with the intent to induce them to come to the United States, where they were ultimately indentured to Defendants for indeterminate periods of time under threat of serious harm and abuse of legal process.

148. Defendants misrepresented the nature of its unenforceable contractual penalty provision by, among other things, falsely representing the workload and insufficient staffing at their facilities. Only after coming to the United States did Plaintiffs and Class Members understand that Defendants would demand, sue, and threaten to sue workers for leaving work before the end of their commitment period and not paying unenforceable penalties and kickbacks.

149. Defendants failed to tell Plaintiffs and Class Members that healthcare workers its clients hired from the United States were paid more for less work than those workers Defendants recruited from outside the country and placed with its clients, instead suggesting to them in communications and in their visa petitions that they would be paid equally to similarly situated workers. These statements misrepresented to Plaintiffs and Class Members the nature of their employment, working conditions, and their pay relative to the workers working alongside them, deceiving them into thinking they were accepting jobs for competitive wages in the United States.

150. Further, Defendants have knowingly made numerous misrepresentations to United States Citizenship and Immigration Services ("USCIS") with respect to Defendants' recruitment and employment of Plaintiffs and Class Members.

151. Defendants knowingly misrepresented on its I-140 petitions that its terms of employment comply with state law, when in fact its contracts include an illegal payment and kickback and penalty provision under state law because it is not an estimate of Defendant's damages. These misrepresentations constitute repeated instances of fraud in violation of 18 U.S.C. § 1546.

152. Defendants knowingly misrepresent on its Form I-140 that it pays its green card workers prevailing wages when in fact it does not offer or pay those wages free and clear because it seeks and recovers payment and kickbacks from these workers to pay business expenses through its illegal penalty provision reducing their pay.

153. Defendants' scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and internet or fax transmission of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiffs and Class Members.

154. These fraudulent representations and concealments of material facts constitute repeated acts of wire fraud under 18 U.S.C. § 1343, along with other repeated acts of fraud in foreign labor contracting under 18 U.S.C. § 1351 and repeated acts of fraud and misuse of visas, permits, and other documents under 18 U.S.C. § 1546 (as described below), that Defendants engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

155. On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple other criminal acts indictable under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor),

and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

156. The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies, misrepresentations, and intimidation, to recruit inexpensive foreign healthcare workers, including Plaintiffs and Class Members, to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

157. The fraudulent representations and concealments of material facts described above caused Plaintiffs and the Class Members to experience harm to business or property in the form of expenses related to moving to the United States without pay that they otherwise would not have incurred, penalty payments to Defendants, and reduced wages. Thus, Plaintiffs and Class Members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

158. Plaintiffs suffered damages as a direct and proximate result of Defendants' RICO violations based on its racketeering activity under 18 U.S.C. § 1343 and 18 U.S.C. § 1351.

159. Plaintiffs are entitled to compensatory threefold compensatory damages in amounts to be determined a trial, together with reasonable attorneys' fees and the costs of this Action. *See* 18 U.S.C. § 1964(c).

160. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct and racketeering activity, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

## <u>COUNT V</u>
## RACKETEERING ACTIVITY UNDER 18 U.S.C. § 1351 IN VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1961, *et seq.*
**(On behalf of Plaintiffs and all Classes)**

161. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

162. The Racketeer Influence and Corrupt Organizations Act ("RICO") prohibits "racketeering activity."

163. "Racketeering activity" includes conduct relating to wire fraud in violation of 18 U.S.C. § 1343 and conduct relating to fraud in foreign labor contracting in violation of 18 U.S.C. § 1351. *See* 18 U.S.C. § 1961(1).

164. Defendants are "persons," as defined by RICO, 18 U.S.C. § 1961(3).

165. As described above, Defendants' conduct constitutes a RICO "enterprise," as defined by 18 U.S.C. § 1961(4). Specifically, Defendant ICP, together with the separate and distinct Pruitt Defendants, worked cooperatively to recruit and hire foreign healthcare workers in violation of local, state, and federal law. In the alternative, Defendants, together with Pruitt's clients, constitute such an enterprise.

166. Defendants have engaged in the following knowing and material fraudulent representations to and concealments of material facts from foreign healthcare workers, including Plaintiffs and other Class Members, with the intent to induce them to come to the United States, where they were ultimately indentured to Defendants for indeterminate periods of time under threat of serious harm and abuse of legal process.

167. Defendants misrepresented the nature of its unenforceable contractual penalty provision by, among other things, falsely representing the workload and insufficient staffing at their facilities. Only after coming to the United States did Plaintiffs and Class Members understand that Defendants would demand, sue, and threaten to sue workers for leaving work before the end of their commitment period and not paying unenforceable penalties and kickbacks.

168. Defendants failed to tell Plaintiffs and Class Members that healthcare workers its clients hired from the United States were paid more for less work than those workers Defendants recruited from outside the country and placed with its clients, instead suggesting to them in communications and in their visa petitions that they would be paid equally to similarly situated workers. These statements misrepresented to Plaintiffs and Class Members the nature of their employment, working conditions, and their pay relative to the workers working alongside them, deceiving them into thinking they were accepting jobs for competitive wages in the United States.

169. Defendants' scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and internet or fax transmission of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiffs and Class Members.

170. These fraudulent representations and concealments of material facts constitute repeated acts of fraud in foreign labor contracting under 18 U.S.C. § 1351, along with other repeated acts of wire fraud under 18 U.S.C. § 1343 (as described above), that Defendants engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

171. On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple other criminal acts indictable under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

172. The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies, misrepresentations, and intimidation, to recruit inexpensive foreign healthcare workers, including Plaintiffs and Class Members, to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

173. The fraudulent representations and concealments of material facts described above caused Plaintiffs and the Class Members to experience harm to business or property in the form of expenses related to moving to the United States without pay that they otherwise would not have incurred, penalty payments to Defendants, and reduced wages. Thus, Plaintiffs and Class Members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

174. Plaintiffs suffered damages as a direct and proximate result of Defendants' RICO violations based on its racketeering activity under 18 U.S.C. § 1343 and 18 U.S.C. § 1351.

175. Plaintiffs are entitled to threefold compensatory damages in amounts to be determined a trial, together with reasonable attorneys' fees and the costs of this Action. *See* 18 U.S.C. § 1964(c).

176. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct and racketeering activity, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT VI**
**RACKETEERING ACTIVITY UNDER 18 U.S.C. § 1546**
**IN VIOLATION OF THE RACKETEER INFLUECED**
**AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. § 1961, *et seq.***
**(On behalf of Plaintiffs and all Classes)**

177. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

178. The Racketeer Influence and Corrupt Organizations Act ("RICO") prohibits "racketeering activity."

179. "Racketeering activity" includes conduct relating to fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546. *See* 18 U.S.C. § 1961(1).

180. Defendants are "persons," as defined by RICO, 18 U.S.C. § 1961(3).

181. As described above, Defendants' conduct constitutes a RICO "enterprise," as defined by 18 U.S.C. § 1961(4). Specifically, Defendant ICP, together with the separate and distinct Pruitt Defendants, worked cooperatively to recruit and hire foreign healthcare workers in violation of local, state, and federal law. In the alternative, Defendants, together with Pruitt's clients, constitute such an enterprise.

182. Defendants have knowingly made numerous misrepresentations to United States Citizenship and Immigration Services ("USCIS") with respect to Defendants' recruitment and employment of Plaintiffs and Class Members.

183. Defendants knowingly misrepresented on its I-140 petitions that its terms of employment comply with state law, when in fact its contracts include an illegal payment and kickback and penalty provision under state law because it is not an estimate of Defendant's damages. These misrepresentations constitute repeated instances of fraud in violation of 18 U.S.C. § 1546.

184. Defendants knowingly misrepresent on its Form I-140 that it pays its green card workers prevailing wages when in fact it does not offer or pay those wages free and clear because it seeks and recovers payment and kickbacks from these workers to pay business expenses through its illegal penalty provision reducing their pay.

185. Defendants' scheme to defraud relied upon multiple repeated uses of the wires, including through email, telephone, and internet or fax transmission of relevant visa petitions and paperwork. The scheme was reasonably calculated to deceive and defraud Plaintiffs and the Class.

186. These fraudulent representations and concealments of material facts constitute repeated acts of fraud and misuse of visas, permits, and other documents under 18 U.S.C. § 1546, along with other repeated acts of wire fraud under 18 U.S.C. § 1343 (as described above), that Defendants engaged in as part of its activities conducting or conspiring to conduct the enterprise's affairs.

187. On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple other criminal acts indictable under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

188. The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies, misrepresentations, and intimidation, to recruit inexpensive foreign healthcare workers, including Plaintiffs and Class Members, to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

189. The fraudulent representations and concealments of material facts described above caused Plaintiffs and the Class Members to experience harm to business or property in the form of expenses related to moving to the United States without pay that they otherwise would not have

incurred, penalty payments to Defendants, and reduced wages. Thus, Plaintiffs and Class Members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

190. Plaintiffs suffered damages as a direct and proximate result of Defendants' RICO violations based on its racketeering activity under 18 U.S.C. § 1343 and 18 U.S.C. § 1546.

191. Plaintiffs are entitled to threefold compensatory damages in amounts to be determined a trial, together with reasonable attorneys' fees and the costs of this Action. *See* 18 U.S.C. § 1964(c).

192. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct and racketeering activity, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT VII**
**RACKETEERING ACTIVITY UNDER 18 U.S.C. § 1589 AND 18 U.S.C. § 1590**
**IN VIOLATION OF THE RACKETEER INFLUECED**
**AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. § 1961, *et seq.***
**(On behalf of Plaintiffs and all Classes)**

193. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

194. The Racketeer Influence and Corrupt Organizations Act ("RICO") prohibits "racketeering activity."

195. "Racketeering activity" includes conduct relating to forced labor in violation of 18 U.S.C. § 1589 and conduct relating to trafficking in persons in violation of 18 U.S.C. § 1590. *See* 18 U.S.C. § 1961(1).

196. Defendants are "persons," as defined by RICO, 18 U.S.C. § 1961(3).

197. As described above, Defendants' conduct constitutes a RICO "enterprise," as defined by 18 U.S.C. § 1961(4). Specifically, Defendant ICP, together with the separate and distinct

Pruitt Defendants, worked cooperatively to recruit and hire foreign healthcare workers in violation of local, state, and federal law. In the alternative, Defendants, together with Pruitt's clients, constitute such an enterprise.

198. For the reasons described above, Defendants engage in multiple repeated violations of trafficking and attempted trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. §§ 1589 and 1590. Defendants engage in that conduct as part of its activities conducting or conspiring to operate the affairs of the enterprise with the goal of furthering the enterprises purposes of obtaining and supplying inexpensive foreign healthcare workers to United States healthcare providers.

199. On its own, this conduct constitutes a pattern of racketeering activity. Alternatively, it constitutes a pattern of racketeering activity in conjunction with multiple other criminal acts indictable under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1351 (fraud in foreign labor contracting), 18 U.S.C. §1546 (visa fraud), 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor), contrary to 18 U.S.C. § 1962(c) and (d). The activities described above are part of that pattern.

200. The pattern is part of a related and continuous scheme of misconduct over the past several years designed to use lies, misrepresentations, and intimidation, to recruit inexpensive foreign healthcare workers, including Plaintiffs and Class Members, to the United States and keep them trapped in their jobs with illegal contractual terms, workplace policies, and threats.

201. The fraudulent representations and concealments of material facts described above caused Plaintiffs and the Class Members to experience harm to business or property in the form of

expenses related to moving to the United States without pay that they otherwise would not have incurred, penalty payments to Defendants, and reduced wages. Thus, Plaintiffs and Class Members are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

202. Plaintiffs suffered damages as a direct and proximate result of Defendants' RICO violations based on its racketeering activity under 18 U.S.C. §§ 1589 and 1590.

203. Plaintiffs are entitled to threefold compensatory damages in amounts to be determined a trial, together with reasonable attorneys' fees and the costs of this Action. *See* 18 U.S.C. § 1964(c).

204. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct and racketeering activity, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

## COUNT VIII
## VIOLATION OF TENNESSEE LAW
## Tenn. Code Ann. § 39-13-301, *et seq.*
## (On behalf of Plaintiffs and all Classes)

205. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

206. Tennessee law imposes liability on anyone engaged in involuntary servitude. "Involuntary servitude" includes knowingly abusing or threatening to abuse the law or legal process; using blackmail or using or threatening to cause financial harm for the purpose of exercising financial control over a person; or controlling a person's movements through threats or violence. Tenn. Code Ann. § 39-13-307(a).

207. Tennessee law imposes liability on anyone who knowingly recruits, entices, harbors, transports, provides, or obtains by any means any person with intent that the person be subjected to involuntary servitude. Tenn. Code Ann. § 39-13-308(a)(1).

208. Tennessee law also imposes liability on anyone who attempts to recruit, entice, harbor, transport, provide, or obtain by any means any person with intent that the person be subjected to involuntary servitude. Tenn. Code Ann. § 39-13-308(a)(1).

209. Likewise, Tennessee law imposes liability on anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture that has engaged in involuntary servitude. Tenn. Code Ann. § 39-13-308(a)(2).

210. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to abuse the law or legal process; and knowingly abusing the law or legal process via demand letters and lawsuits seeking to enforce illegal contractual penalties against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm

211. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to cause financial harm; and directly causing financial harm via demand letters and suits against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

212. Further, Defendant ICP recruited, enticed, harbored, transported, and provided Plaintiffs and Class Members to the Pruitt Defendants to be hired as Pruitt employees with the knowledge that Plaintiffs and Class Members would be subjected to involuntary servitude through the abuse or threat of abuse of the law or legal process or through threats of financial harm against Plaintiffs and Class Members to compel them to remain under their employment.

213. The Pruitt Defendants hired Plaintiffs and Class Members based upon their recruitment by Defendant ICP through a conspiracy and venture established by Defendants for their mutual benefit, and the Pruitt Defendants knowingly benefited from their participation in this venture and knowingly benefitted from Plaintiffs' and Class Members' labor.

214. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in order to exert pressure on Plaintiffs to continue working for the Defendants and to refrain from seeking employment elsewhere.

215. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of forced labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

216. Defendants knowingly recruited, transported, provided, and obtained Plaintiffs for forced labor or services in violation of Tenn. Code Ann. §§ 39-13-307 and 39-13-308. Further, Defendants benefit from this conduct in violation of Tenn. Code Ann. §§ 39-13-307 and 39-13-308.

217. Plaintiffs suffered damages as a direct and proximate result of Defendants' conduct.

218. Plaintiffs are entitled to actual, compensatory, and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

219. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

<u>**COUNT IX**</u>
**VIOLATION OF GEORGIA LAW**
**Ga. Code Ann. § 16-5-46**
**(On behalf of Plaintiffs and all Classes)**

220. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

221. Georgia law imposes liability on anyone who knowingly subjects another person to or maintains another person in labor servitude. Ga. Code Ann. § 16-5-46(b).

222. Georgia law imposes liability on anyone who knowingly recruits, entices, harbors, transports, provides, or obtains by any means another person for the purpose of labor servitude. Ga. Code Ann. § 16-5-46(b).

223. "Labor servitude" means work or service of economic or financial value which is performed or provided by another individual and is induced or obtained by coercion or deception. Ga. Code Ann. § 16-5-46(a)(5).

224. "Coercion" includes causing or threatening to cause financial harm to any individual or using financial control over any individual. Ga. Code Ann. § 16-5-46(a)(1)(E). "Deception" includes creating or confirming another's impression of an existing fact or past event which is false and which the accused knows or believes to be false. Ga. Code Ann. § 16-5-46(a)(3)(A).

225. Likewise, Georgia law imposes liability on anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture or scheme which such person or entity knew or should have known involved a violation of Ga. Code Ann. § 16-5-46. *See* Ga. Code Ann. § 51-1-56(a)(2).

226. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to abuse the law or legal process; and

knowingly abusing the law or legal process via demand letters and lawsuits seeking to enforce illegal contractual penalties against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm

227. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to cause financial harm; and directly causing financial harm via demand letters and suits against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

228. Further, Defendant ICP recruited, enticed, harbored, transported, and provided Plaintiffs and Class Members to the Pruitt Defendants to be hired as Pruitt employees with the knowledge that Plaintiffs and Class Members would be subjected to involuntary servitude through the abuse or threat of abuse of the law or legal process or through threats of financial harm against Plaintiffs and Class Members to compel them to remain under their employment.

229. The Pruitt Defendants hired Plaintiffs and Class Members based upon their recruitment by Defendant ICP through a conspiracy and venture established by Defendants for their mutual benefit, and the Pruitt Defendants knowingly benefited from their participation in this venture and knowingly benefitted from Plaintiffs' and Class Members' labor.

230. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs by coercion or deception, specifically by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in

order to exert pressure on Plaintiffs to continue working for the Defendants and to refrain from seeking employment elsewhere.

231. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of forced labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means

232. Defendants knowingly recruited, transported, provided, and obtained Plaintiffs for forced labor or services in violation of Ga. Code Ann. § 16-5-46. Further, Defendants benefit from this conduct in violation of Ga. Code Ann. § 51-1-56.

233. Plaintiffs suffered damages as a direct and proximate result of Defendants' conduct.

234. Plaintiffs are entitled to actual, compensatory, and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

235. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

## COUNT X
## VIOLATION OF NORTH CAROLINA LAW
## N.C. Gen. Stat. § 14-43.10, *et seq.*
## (On behalf of Plaintiffs and all Classes)

236. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

237. North Carolina law imposes liability on anyone who knowingly, or in reckless disregard of the consequences, recruits, entices, harbors, transports, provides, patronizes, solicits, or obtains by any means another person with the intent that the other person be held in involuntary servitude. N.C. Gen. Stat. § 14-43.11(a).

238. North Carolina law imposes liability on anyone who knowingly, willfully, or in reckless disregard of the consequences of the action holds another person in involuntary servitude. N.C. Gen. Stat. § 14-43.12(a). "Involuntary servitude" includes the performance of labor, whether or not for compensation, by deception, coercion, or intimidation by any means. N.C. Gen. Stat. § 14-42.10(a)(3).

239. Likewise, North Carolina law imposes liability on anyone who knowingly benefits financially or by receiving anything of value from participation in a venture which that person knew or should have known violated such provisions of North Carolina law through recruiting, enticing, harboring, transporting, providing, patronizing, soliciting, or obtaining by any means any person to be held in involuntary servitude, or by holding any person in involuntary servitude. N.C. Gen. Stat. § 14-43.18(a).

240. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to abuse the law or legal process; and knowingly abusing the law or legal process via demand letters and lawsuits seeking to enforce illegal contractual penalties against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm

241. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to cause financial harm; and directly causing financial harm via demand letters and suits against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

242. Further, Defendant ICP recruited, enticed, harbored, transported, and provided Plaintiffs and Class Members to the Pruitt Defendants to be hired as Pruitt employees with the knowledge that Plaintiffs and Class Members would be subjected to involuntary servitude through the abuse or threat of abuse of the law or legal process or through threats of financial harm against Plaintiffs and Class Members to compel them to remain under their employment.

243. The Pruitt Defendants hired Plaintiffs and Class Members based upon their recruitment by Defendant ICP through a conspiracy and venture established by Defendants for their mutual benefit, and the Pruitt Defendants knowingly benefited from their participation in this venture and knowingly benefitted from Plaintiffs' and Class Members' labor.

244. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs by deception, coercion, and intimidation, specifically by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in order to exert pressure on Plaintiffs to continue working for the Defendants and to refrain from seeking employment elsewhere.

245. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of forced labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means

246. Defendants knowingly recruited, transported, provided, and obtained Plaintiffs for forced labor or services in violation of N.C. Gen. Stat. §§ 14-43.11 and 14-43.12. Further, Defendants benefit from this conduct in violation of N.C. Gen. Stat. § 14-43.18(a).

247. Plaintiffs suffered damages as a direct and proximate result of Defendants' conduct.

248. Plaintiffs are entitled to compensatory, general, and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

249. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT XI**
**VIOLATION OF SOUTH CAROLINA LAW**
**S.C. Code Ann. § 16-3-2010, *et seq.***
**(On behalf of Plaintiffs and all Classes)**

250. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

251. South Carolina law imposes liability on anyone who recruits, entices, solicits, transports, provides, or obtains a victim, with knowledge that the victim will be subjected to, or for the purposes of, forced labor or services or involuntary servitude. S.C. Code Ann. § 16-3-2020(a)(1).

252. Likewise, South Carolina law imposes liability on anyone who financially benefits from participation in a venture which has engaged in recruiting, enticing, soliciting, transporting, providing, or obtaining a victim, with knowledge that the victim will be subjected to, or for the purposes of, forced labor or services or involuntary servitude. S.C. Code Ann. § 16-3-2020(a)(1).

253. "Involuntary servitude" means a condition of servitude induced through coercion. S.C. Code Ann. § 16-3-2010(5).

254. South Carolina law imposes liability on anyone who attempts to recruit, entice, solicit, transport, provide, or obtain a victim, with knowledge that the victim will be subjected to, or for the purposes of, forced labor or services or involuntary servitude. S.C. Code Ann. § 16-3-2020(a)(1).

255. South Carolina law imposes liability on anyone who aids, abets, or conspires with another person, or attempts to aid, abets, or conspire, to recruit, entice, solicit, transport, provide, or obtain a victim, with knowledge that the victim will be subjected to, or for the purposes of, forced labor or services or involuntary servitude. S.C. Code Ann. § 16-3-2020(a)(2).

256. South Carolina law imposes liability on anyone who aids, abets, or conspires with another person, or attempts to aid, abets, or conspire, to financially benefit from participation in a venture which has engaged in recruiting, enticing, soliciting, transporting, providing, or obtaining a victim, with knowledge that the victim will be subjected to, or for the purposes of, forced labor or services or involuntary servitude. S.C. Code Ann. § 16-3-2020(a)(2).

257. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to abuse the law or legal process; and knowingly abusing the law or legal process via demand letters and lawsuits seeking to enforce illegal contractual penalties against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm

258. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to cause financial harm; and directly causing financial harm via demand letters and suits against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

259. Further, Defendant ICP recruited, enticed, harbored, transported, and provided Plaintiffs and Class Members to the Pruitt Defendants to be hired as Pruitt employees with the

knowledge that Plaintiffs and Class Members would be subjected to involuntary servitude through the abuse or threat of abuse of the law or legal process or through threats of financial harm against Plaintiffs and Class Members to compel them to remain under their employment.

260. The Pruitt Defendants hired Plaintiffs and Class Members based upon their recruitment by Defendant ICP through a conspiracy and venture established by Defendants for their mutual benefit, and the Pruitt Defendants knowingly benefited from their participation in this venture and knowingly benefitted from Plaintiffs' and Class Members' labor.

261. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs through coercion, specifically by means of the abuse or threatened abuse of law or legal process, including without limitation the use or threatened use of a law or legal process in order to exert pressure on Plaintiffs to continue working for the Defendants and to refrain from seeking employment elsewhere.

262. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of forced labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

263. Defendants knowingly recruited, transported, provided, and obtained Plaintiffs for forced labor or services in violation of S.C. Code Ann. § 16-3-2020. Further, Defendants benefit from this conduct in violation of S.C. Code Ann. § 16-3-2020.

264. Plaintiffs suffered damages as a direct and proximate result of Defendants' conduct.

265. Plaintiffs are entitled to actual, compensatory, and punitive damages in amounts to be determined at trial, along with any other appropriate relief, together with reasonable attorneys' fees and the costs of this Action.

266. Because Defendants' conduct was willful and malicious, Plaintiffs are entitled to treble their actual damages in an amount to be determined at trial.

267. Plaintiffs are also entitled to injunctive relief to enjoin Defendants' conduct, including but not limited to enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

**COUNT XII**
**BREACH OF CONTRACT**
**(On behalf of Plaintiffs and all Classes)**

268. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

269. Plaintiffs and Class Members entered into valid and binding employment contracts with Defendants.

270. Plaintiffs and Class Members substantially performed under the contracts.

271. Defendants breached the contracts by failing to pay Plaintiffs and Class Members the prevailing wages required by their contracts.

272. Defendants breached the contracts by failing to pay Plaintiffs and Class Members for all hours worked.

273. Defendants breached the contracts by failing to provide Plaintiffs and Class Members with meal and rest breaks.

274. The Plaintiffs and Class Members suffered damages as a direct and proximate result of these breaches.

275. The Plaintiffs are entitled to compensatory damages for breach of contract in amounts to be determined at trial, in addition to unpaid wages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT XIII
## DECLARATORY JUDGMENT
## (On behalf of Plaintiffs and all Classes)

276. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

277. The contract termination fee is unenforceable under federal and state law, as described above.

278. The contract termination fee is also unenforceable under the Anti-Peonage Law, 42 U.S.C. § 1994.

279. Plaintiffs and other Class Members have a definite and concrete dispute with Defendants concerning the enforceability of the contract termination fee.

280. The dispute touches the legal relations of parties having adverse legal interests.

281. The dispute is real and substantial.

282. The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

283. As described above, the contract termination fee present in Plaintiffs' and Class Members' contracts are unenforceable and the Court should issue an order declaring such contract provisions null, void, and unenforceable.

284. Moreover, the Court should enjoin Defendants from enforcing such contracts against Plaintiffs and Class Members, including enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member.

## COUNT XIV
## UNJUST ENRICHMENT
## (On behalf of Plaintiffs and all Classes)

285. Plaintiffs repeat and reallege each and every allegation set forth above as if fully restated herein.

286. Defendants have been enriched by receiving the benefits of Plaintiffs' and Class Members' labor through Defendants' improper and illegal conduct and through Defendants' illegal scheme, as described above.

287. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to abuse the law or legal process; and knowingly abusing the law or legal process via demand letters and lawsuits seeking to enforce illegal contractual penalties against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm

288. Defendants knowingly provided and obtained the forced labor and services of Plaintiffs and Class Members by means of threatening to cause financial harm; and directly causing financial harm via demand letters and suits against Plaintiffs and Class Members that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

289. Further, Defendant ICP recruited, enticed, harbored, transported, and provided Plaintiffs and Class Members to the Pruitt Defendants to be hired as Pruitt employees with the knowledge that Plaintiffs and Class Members would be subjected to involuntary servitude through

the abuse or threat of abuse of the law or legal process or through threats of financial harm against Plaintiffs and Class Members to compel them to remain under their employment.

290. The Pruitt Defendants hired Plaintiffs and Class Members based upon their recruitment by Defendant ICP through a conspiracy and venture established by Defendants for their mutual benefit, and the Pruitt Defendants knowingly benefited from their participation in this venture and knowingly benefitted from Plaintiffs' and Class Members' labor.

291. Defendants have been unjustly enriched at the expense of Plaintiffs and Class Members.

292. It is against equity and good conscience to allow Defendants to retain the benefits they accrued as a result of their improper conduct; the operation of their illegal scheme; the recruitment of Plaintiffs and Class Members into illegal labor under threats, coercion, and false pretenses; the hiring of Plaintiffs and Class Members and maintaining their labor through threats, coercion, and false pretenses; and the violation of federal and state law, regulations, and policies.

293. Plaintiffs are entitled to restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this Action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Classes, respectfully request that the Court:

a. Determine that the claims alleged herein may be maintained as a class action under Federal Rule of Civil Procedure 23, and issue an order certifying one or more Classes as defined above;

b. Appoint all Plaintiffs as representatives of the Nationwide Class, and appoint:

1. Plaintiffs Russell Javier Melendres and Erika June Oyammi Lubiano as representatives of the North Carolina Class, and

2. Plaintiff Chinonyerem Princess Eze as a representative of the South Carolina Class;

c. Appoint all Plaintiffs' counsel as Class Counsel;

d. Award all actual, compensatory, general, special, consequential, and punitive damages and restitution to which Plaintiffs and the Class Members are entitled;

e. Award pre-judgment and post-judgment interest on such monetary relief;

f. Grant appropriate injunctive and declaratory relief, including without limitation an order enjoining Defendants from enforcing any contracts, which contain the illegal termination fees described above, against Plaintiffs and Class Members, including enjoining any pending or future actions seeking enforcement of the contractual penalties against Plaintiffs or any Class Member;

g. Award reasonable attorneys' fees and costs; and

h. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

/s/ *Adam A. Edwards*
Adam A. Edwards, TN BPR 023253
William A. Ladnier, TN BPR 034316
Alexandr Rudenco, TN BPR 040554
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080

Fax: (865) 522-0049
aedwards@milberg.com
wladnier@milberg.com
arudenco@milberg.com

Ashleigh Beer-Vineyard, TN BPR 038399
Robert Dziewulski, TN BPR 037044
**DZ LAW, PLLC**
4315 Kingston Pike, Ste. 210
Knoxville, TN 37919
Tel.: (865) 259-0020
Fax: (865) 635-4744
ashleighbeer@dzlaw.law
bobdz@dzlaw.law